UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re the Matter of D.A.

NIKOLAOS ADAMIS,

                      Petitioner,

                 - against -

FOTINI LAMPROPOULOU, a/k/a FOTINY
LAMBROPOULOS,

                      Respondent.

-------------------------------------------------------X

**MEMORANDUM & OPINION**

14-CV-5836 (PKC)

PAMELA K. CHEN, United States District Judge:

On October 6, 2014, Petitioner Nikolaos Adamis ("Adamis" or "Petitioner") filed a verified petition, pursuant to the Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act ("Hague Convention"), 42 U.S.C. § 11601 *et seq.*, for the return of his minor son, D.A., against D.A.'s mother, Fotini Lampropoulou, a/k/a Fotiny Lambropoulos ("Respondent"), who was living with D.A. in Douglaston, New York at the time. In his petition, Adamis alleged, *inter alia*, that Respondent had moved D.A. from Greece to the United States without Petitioner's knowledge or consent. (Dkt. 1, Verified Petition for Return of Minor Child to Greece ("Petition"), ¶¶ 16-22).

Between November 12-21, 2014, the Court conducted a five-day bench trial in this action.[1] Because Adamis was in Greece for the entire proceeding[2], he testified and participated

---

[1] The bench trial began on November 12, 2014, and the Court heard testimony through November 14, 2014. The Court resumed proceedings on November 20, 2014 and concluded the trial on November 21, 2014, for a total of five days. The trial transcript is consecutively

in the proceeding via video conference, as did two other witnesses located in Greece. Respondent and other witnesses called by each party testified in court. The Court also interviewed D.A. *in camera*, but on record and in the presence of both parties' counsel, to determine his wishes regarding his place of residence. Both parties introduced, and adduced testimony about, numerous exhibits, which included documents, photographs, audio recordings, and physical items.

At the conclusion of the trial, the Court denied the petition, and ruled that D.A. would not be required to return to Greece to live with his father and that he could remain in the United States with his mother. (Tr. A at 133-39.) Although the Court summarized the reasons for that decision on the record, it also indicated that a written decision would follow. *Id.*

The Court now makes the following findings of fact and conclusions of law. Only those facts the Court deems necessary for the resolution of the petition will be discussed.

## I. FINDINGS OF FACT

### A. Parties

D.A. is the son of Petitioner and Respondent. At the time of the trial, D.A. was 12 years old. (Petitioner's Exhibits ("PX") 29; Tr. 52, 196.) D.A. has a stepsister, Toula Tufano ("Toula"),[3] who is Respondent's daughter from a previous marriage. (Tr. 44, 378.) Toula was 22 years old at the time of the trial. (Tr. 44, 196, 284.)

---

numbered for the sessions held on November 12, 13, 14 and 20, and begins its numbering anew on November 21. For citation purposes, the Court will cite to the transcript for 11/12/14 to 11/20/14 as "Tr." and 11/21/14 as "Tr. A."

[2] During the trial, evidence was introduced indicating that there was an outstanding warrant in New York for Petitioner's arrest based on his alleged failure to pay child support to his first wife. (Tr. 109-13, 118-20, 372-75, 395; Respondent Ex. ("RX") U.)

[3] Although Toula is D.A.'s stepsister, they consider, and refer to each other, as brother and sister, which convention the Court will follow. (*See, e.g.*, Tr. 190, 195-96, 292.)

Petitioner is a U.S. and Greek citizen who was living in the United States in the 1990s. (Tr. 43, 111, 126, 260; Petition, Ex. 3)[4] Respondent is a Canadian citizen of Greek heritage who moved to New York with her family in 1968. (Tr. 260, 377-78.) She met Petitioner in the 1990s. (Tr. 43, 378-79.) When they met, Respondent's daughter from another marriage, Toula, was two or three years old. (Tr. 44.) Respondent also had a son, Christos, from a previous marriage, and was going through a divorce from Christos's mother. (Tr. 43, 379.)

On September 2, 2001, Petitioner and Respondent wed in Greece. (Tr. 46, 381.) After the events of 9/11, which occurred only days later, Petitioner decided that they would relocate, with Toula, to Greece. (Tr. 46-49, 381.) Although Petitioner and Respondent moved to Greece for a "better lifestyle," their financial situation in Greece was precarious and, at times, difficult. (Tr. 64-65, 388, 390; Tr. A 38-39.) Petitioner ran his own restaurant business, and Respondent worked as a chef at Harding University ("Harding"), an American university that had a branch in Greece. (Tr. 65, 215, 389; Tr. A 38, 63.) The majority of Respondent's family lives in the United States, although she has some relatives in Greece. (Tr. 50, 59, 222-23.)

B.   D.A.'s Life in Greece

D.A. was born in Greece in October 2002, and lived there continuously until he was brought to the United States by his mother in December 2013. (Tr. 52, 205, 260.) For most of the time, D.A. lived with his mother, father and sister in a house in the town of Porto Rafti, which is where many of Petitioner's family members reside. (Tr. 42, 49-50, 292.) D.A.'s father, however, often stayed in Athens instead of Porto Rafti, because his business was located there.

---

[4] It appears that Petitioner attended high school in Queens, New York. (Tr. 146.)

(Tr. 127-29, 220, 292-93.)[5] D.A. had few friends, and did not spend much time with the relatives on his father's side. (Tr. 195, 201-02, 392-93; Tr. A 89.)

D.A. attended the local grammar school in Porto Rafti. (Tr. 57, 200-01, 390.) Beginning in fourth grade, as it became increasingly more difficult for D.A. to learn in Greek, he developed anxiety about going to school. (Tr. 205; Tr. A 43-44.) As a result, D.A. was absent from school for about one month in fourth grade. (Tr. 213-14, 390-91.)[6] Around that time, D.A. and his parents began discussing the possibility of D.A. going to school in the United States. (Tr. 240-42; Tr. A 31; *see infra.*)[7]

Each Christmas, D.A. would travel with his mother and sister to visit his mother's family in the United States. (Tr. 59-60, 197, 310-11, 341, 394.) They would typically stay for one or two weeks. (Tr. 264-65, 341.)

C. **D.A.'s Relocation to the United States in December 2013**

Discussions about moving to the United States began when D.A. was in fourth grade, prompted by the difficulties he was facing in school. (Tr. 240-41, 295-96.) After D.A. told his mother he could no longer handle his school situation, she told Petitioner that they had to move to the United States for D.A.'s sake. (Tr. 240-41, 395-96, 738, 742-43.) Petitioner responded,

---

[5] Toula described Petitioner as living in "his own private apartment in Athens" as of 2013. (Tr. 292.) According to Toula, Petitioner came to Porto Rafti 2-4 four times per month. (Tr. 293.) Respondent made the rent payments for the Porto Rafti house. (Tr. 140-41.) Athens is about 20-25 minutes away, by car, from Porto Rafti. (Tr. 384; Tr. A 89.)

[6] Petitioner disputed these facts, testifying, in response to cross-examination, that he did not know that D.A. hated school in Greece or that Petitioner was known as "The American" at the school. (Tr. 152-53.) D.A.'s sister, Toula, who was born in the United States and moved with Respondent and Petitioner to Greece when she was 8, also experienced difficulty being taught in Greek, and was eventually home-schooled by her mother, starting at 13 years of age. (Tr. 284-87, 382-83.)

[7] Petitioner testified that these conversations were only about D.A. eventually going to college in the United States. (Tr. 57-58.)

4

"Okay, okay, whatever makes you happy." (Tr. 206, 214, 241, 281-82, 396, 680.) It took time, however, to raise the money to move to the United States. (Tr. 215, 403, 682.) Thereafter, D.A.'s mother repeatedly raised the topic of moving with Petitioner, and he told her several times that they could go. (Tr. 668-69, 682-84, 733-34.)

In the summer of 2013, D.A.'s mother began planning the move in earnest. She told D.A. that they were going to move, and began packing their household items and personal belongings to be shipped to the United States. (Tr. 243-44, 294, 400-01, 411-12, 415, 637-49, 651-65.) D.A.'s mother also sold some of their furniture to get money, and prepare, for the move. (Tr. 251-53, 293-94, 411-12; RX A, D.)[8] D.A. spoke to his father directly about the move, saying that there were things that he (D.A.) could not do in Greece and that he wanted to move. (Tr. 245.) D.A.'s father simply responded, "okay, okay." (*Id.*) Sometimes his father would tell him about bad things happening in the United States, such as Superstorm Sandy and killings, to convince him that "America is such a bad place." (Tr. 246-47, 399-400.) Toula spoke to Petitioner about the move in early December 2013 during a conversation when he asked Toula about working in a restaurant he was planning to open in Porto Rafti. (Tr. 295-96.) Toula told Petitioner that she could not work there because she was moving to the United States. (Tr. 296.) Based on various conversations between the family, Petitioner was fully aware of the plans for Petitioner and the children to move to the United States. (Tr. 295-96, 308-09, 395-97, 399-400, 732-33, 742-43.)[9]

---

[8] There is evidence that Petitioner believed that the furniture was also being sold to help pay the rent on the Porto Rafti house. (Tr. 303, 320.)

[9] In addition, about two months prior to the move, boxes containing the family's belongings sat in the living room of the Porto Rafti house before being taken to Harding University for shipment to the United States. (Tr. 294-95, 300, 303, 401-02, 651, 778-79.) Although there was testimony from Petitioner and D.A. about the family possibly moving into Harding housing (Tr.

5

Many people in Porto Rafti knew about the move, including D.A.'s school, his classmates and their families, the family's neighbors, and Respondent's friends and co-workers at Harding. (Tr. 247-49, 403-04, 420-22, 426, 675-76, 734, 748-49.) In fact, Harding performed a farewell song for D.A.'s family at the annual Thanksgiving dinner shortly before they moved, and D.A.'s school class also held a farewell party for him. (Tr. 256-57, 259, 276, 296-99; RX B.) Petitioner's family members in Porto Rafti also knew about the move. (Tr. 249, 749.) D.A.'s grandfather even joked that he would come to the United States and have a snowball fight with D.A. (Tr. 249.)

About one or two months before the move, D.A.'s parents had a conversation about the move that D.A.'s mother recorded on audiotape out of fear that D.A.'s father might change his mind about letting them move after they left. (Tr. 250-51, 680-83; RX HH (audio recording).)[10] D.A. and Toula were present for that conversation. (Tr. 250-51, 309-10.) During that conversation, Petitioner reminded Respondent that he "was the one who said you should go" to the United States:

> Respondent: The fact is that I came here, it doesn't work for me, it has made me unhappy, the situation, so let me try the other way … Live there and come here . . . But I don't feel like this, I feel that I don't want to live here.
>
> Petitioner: You're forgetting one thing.
>
> Respondent: D.A.
>
> Petitioner: No, that I said to you that you should go.

---

243; Tr. A 68) – hence the boxes being shipped to Harding – the Court finds more credible the evidence indicating the boxes were intended for shipment to the United States via Harding.

[10] There is some discrepancy about whether Respondent or D.A. came up with the idea to make the recording and who made it. (*Compare* Tr. 251 to Tr. 305-06, 312-15, 436-37.) The Court does not find either issue particularly relevant; the tape speaks for itself.

6

(RX HH at 17:25-18:14.)[11]

On December 13, 2013, Respondent and D.A. left Porto Rafti to travel to the United States. (Tr. 279, 299.)[12] By that time, the house was almost empty, except for furniture that did not belong to the family, Petitioner's personal belongings, and unwanted personal items D.A. and Respondent left behind. (Tr. 334, 414, 756-57, 760-61.) Petitioner was at the Porto Rafti home that day, having come home the night before so that he could say goodbye. (Tr. 299, 314, 777.)[13] There was no discussion about whether Respondent and D.A. would be returning to Greece. (Tr. 314, 324, 669-71.) Respondent did not view the move as the end of her marriage or relationship with Petitioner. (Tr. 671-72.) Respondent's relatives had arranged for Respondent and her children to live in an apartment in Queens. (Tr. 300-01, 343-44.)

After Respondent and D.A. left for the United States in December 2013, Petitioner changed his mind about letting D.A. live in the United States. (Tr. 281-82, 672.)[14] On January 6, 2013, when Respondent called Petitioner, he asked her when they were returning to Greece. (Tr. 98, 672-73.) Respondent told Petitioner that they were not returning to Greece and reminded him that he knew that they were moving, that they had spoken about the move many

---

[11] Petitioner claimed that when he said "you should go," he meant that Respondent could go to New York for Christmas. (Tr. 79). The Court does not find that interpretation credible because Petitioner's statement is immediately preceded by Respondent explicitly talking about living in the United States, not visiting it. Respondent's testimony regarding the conversation is more credible. (Tr. 674-75 (stating that the context of the discussion was a move to the United States and that it had no relationship to Christmas)).

[12] Toula joined her mother and D.A. in New York the next month. (Tr. 300.)

[13] Petitioner had not been at the Porto Rafti home that week. (Tr. 670.)

[14] Alternatively, Petitioner may not have believed that Respondent was serious about moving to the United States when he said that they could go. (Tr. 679-80.) However, whether Petitioner changed his mind or simply realized that his wife actually intended to move does not affect the dispositive issue of whether Petitioner gave his consent to the move at the time Respondent brought D.A. to the United States in December 2013.

7

times, and that he had seen them packing their belongings. (Tr. 672-73, 773, 777.) Petitioner insisted that Respondent and D.A. return immediately. (Tr. 672-73, 773.)[15]

On January 22, 2014, Respondent went to the Greek Ministry of Justice, and filed a complaint pursuant to Article 13 of the Hague Convention, seeking the return of D.A. to Greece. (PX 28).

D. **D.A.'s Wishes Regarding His Place of Residence**

On November 13, 2014, during the second day of trial, the Court interviewed D.A. in the presence of Petitioner's and Respondent's counsel.[16] (Tr. 188.) The Court's assessment of D.A. is that he is an unusually poised and mature adolescent, who is comfortable with adults, and engaged readily and openly with the Court.[17] The Court found D.A. perceptive, bright, forthright, rational, friendly, credible, and serious about his education. His answers and demeanor evinced clarity about his wishes and the reasons for them, and complete awareness of the consequences of the court proceeding. Although D.A. is clearly close to, and influenced to

---

[15] Petitioner offered evidence relating to his efforts in early January 2014 to determine how D.A. was withdrawn from his school in Greece purportedly without Respondent's knowledge or permission. (Tr. 102-05, 713-14; PX 30.) The Court does not find that this evidence is sufficient to demonstrate that Petitioner did not consent to his son's move to the United States.

[16] The Court did not permit either parent to be present for the interview. Prior to and during the interview, the parties submitted proposed questions for D.A. (Tr. 10, 24-25, 86, 176-86, 238-39.) The Court also decided to elicit information from D.A. both about his wishes regarding his place of residence and about the events that led to his relocation to the United States in December 2013. (Tr. 180-81, 233, 238.)

[17] While the parties offered opposing expert testimony regarding D.A.'s maturity, the Court finds it unnecessary to rely on either expert's opinion in deciding that D.A. is sufficiently mature to object to his return to Greece. *See Haimdas v. Haimdas,* 720 F. Supp. 2d 183, 204 (E.D.N.Y. 2010) (court may refuse to return the child if it finds "that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views") (quoting Hague Convention, Article 13); *see also Poliero v. Centenaro*, 2009 WL 2947193 (E.D.N.Y. Sept. 11, 2009) ("[A] child's maturity is a question to be determined upon the specific facts of each case.").

an extent by his mother,[18] and harbors disappointment and some resentment towards his father, the Court does not find that D.A.'s relationship with his parents or feelings towards them clouded his judgment about his own situation or his wishes about his place of residence. Indeed, D.A.'s reasons for wanting to remain in the United States were rational and sincere, and he seemed genuinely happy about living in the United States.[19]

D.A. wants to "stay in America." (Tr. 189, 226-27.) He recognizes that Greece is beautiful and nice for vacations, but he believes that "America's definitely better to live all year around[]" because his "whole family is here . . . . There's a better school here, and I just like it overall here." (*Id*.; *see* Tr. 191-92.) Since arriving in the United States, D.A. has been living in an apartment with his mother and sister in a building where his mother's aunt and uncle also live. (Tr. 189-90.) D.A. and his sister each have their own bedroom. (Tr . 190.) D.A. is very close to his sister, Toula, and would not want to return to Greece if she remained in the United States, which is her current plan. (Tr. 195-97, 301.) D.A. has many cousins and other relatives around his age, whom he is close to and sees often. (Tr. 191-94.) D.A. sees some of his cousins every day because they go to school and participate in extracurricular activities together, including martial arts, basketball, a school play, and Sunday school/church. (Tr. 193-94, 199-200, 213.) D.A. likes his school in Queens, which is a five-minute walk from his home, because it has many

---

[18] However, all children are influenced to some degree by their parents. Furthermore, when asked whether he felt that he "had to be strong" for his mother, D.A. responded that he did, but that this simply meant comforting her as much as he could so that she would feel better and not be sad. (Tr. 227.) There was no hint that D.A. felt that he had to lie about, or overstate, his desire to remain in the United States in order to "be strong" for his mother.

[19] Notably, Toula's observation is that since moving to the United States, her brother is "finally happy and he's where he wants to be with people that love him and people he wants to be around." (Tr. 304.) She also observed that "[h]e was miserable in Greece." (Tr. 304.) Respondent and her cousin provided similar observations about D.A.'s happiness and smooth adjustment since coming to live in the United States. (Tr. 353-54, 685-86, 688.)

9

more things than his school in Greece, such as a gymnasium and cafeteria. (Tr. 198-99.) D.A. gets to pursue science, which is his favorite subject. (Tr. 200, 207-10.) D.A. has many friends at his current school. (Tr. 201-02, 204-05.) D.A.'s attendance at his current school has been good, and he believes that he is doing pretty well. (Tr. 212-13.)

D.A.'s life in Greece was very different. D.A. did not spend time with, and was not close to, his relatives in Greece, most of whom were on his father's side. (Tr. 194-95.)[20] D.A. did not like school in Greece. D.A.'s entire grammar school, which went up to sixth grade, had about 220-230 students and only one teacher per grade, who taught all of the subjects. (Tr. 203-04.) He did not get much exposure to science or computer science, his favorite subjects. (Tr. 203.) Because the school did not have an auditorium, they performed the school play in a "dusty" basement. (Tr. 199.)[21] Even though D.A. was born in Greece, his first language is English,[22] which made writing and learning in Greek difficult for him. (Tr. 202.) When D.A. was in the fourth grade, he missed school for about one month because of anxiety about these difficulties. (Tr. 213.) D.A. had few friends from school. (Tr. 201-02.) As he got older, D.A. felt that he was not learning anything from school in Greece. (Tr. 205.)

When asked how he would feel if the Court decided that he had to return to Greece, D.A. responded:

---

[20] In fact, while living in Greece, D.A. communicated with his U.S. relatives almost daily via Skype and Facetime. (Tr. 195, 197, 204.)

[21] Respondent similarly described D.A.'s school in Greece as substandard in terms of its facilities and curriculum, and praised D.A.'s school in Queens. Respondent also confirmed that D.A. has many more friends and relatives with whom he is close in the United States than he had in Greece, and that he is now excelling in school and participating in a variety of extracurricular activities. (Tr. 685-88.)

[22] During the Court's interview of D.A., he spoke unaccented English, as if he had grown up in the United States.

> I really wouldn't want to go, but if you decide, I would be very angry and I would be sad because I would, I would be going to a place that I, I don't want to go. Like, it's challenging and there's nothing for me there and, yeah.

(Tr. 216-17.) D.A. also believes that if he were required to move back to Greece, his mother would move there to be with him and then she would be depressed because she would be separated from her family in the United States and would have to give up her job as a paralegal and go back to cooking at Harding University. (Tr. 224-25.)

D.A. was angry and annoyed by his father's messages to him after D.A. moved to the United States, asking when the family was returning to Greece. (Tr. 217.)[23] D.A. told his father, whom he refers to as "Nick," that "we're not coming back . . . . I'm like, Nick, stop trying to get me back. I like it here. I'm excelling in school. I love it here." (*Id.*)[24] D.A. feels that based on how his father treats him and his situation in Greece, that Greece is not the "ideal place" for him. (Tr. 225.)

D.A. understands that this proceeding is "really all about" him and that what he said during the interview would have an impact on the outcome of the proceeding. (Tr. 225, 229-30.) D.A. did not feel any pressure to answer the Court's questions in a certain way and just wanted to be able "to say [his] side" (Tr. 229-30), namely, that he wants "to stay in America very, very badly." (Tr. 226-27.)

---

[23] D.A. stated that these statements were made several weeks before the proceedings began (Tr. 217), and so the Court does not view them as establishing that Petitioner was unaware that D.A. was not returning to Greece.

[24] D.A. did not describe a close relationship with his father, and stated that his father only took him out alone on two occasions. (Tr. 218-19.) Toula similarly described an "unhappy" home and a distant relationship with Respondent, whom she also refers to as "Nick." (Tr. 288.)

11

II. **CONCLUSIONS OF LAW**

To prevail on a claim under Article 13 of the Hague Convention, Petitioner must demonstrate, by preponderance of the evidence, that: (1) D.A. was a "habitual resident in Greece" before his removal to and retention in the United States, and (2) Petitioner's removal or retention of D.A. was wrongful. *See Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (citing ICARA); *see also* 22 U.S.C. § 9003(e)(1). A removal is "wrongful" where there is a breach of the petitioner's custody rights as to the minor child, "either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention." *See* Hague Convention, Art. 3 and 5. The removal or retention is not wrongful where the petitioner was not "actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention." Hague Convention, Art. 13(a); *see also* 22 U.S.C. § 9003(e)(2)(B). In addition, Article 13 of the Hague Convention recognizes an "age and maturity exception" that allows a court to refuse to return the child if it finds "that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 204 (E.D.N.Y. 2010) (quoting Article 13 of the Convention). Respondent must establish either the defense of consent or the "age and maturity" exception by a preponderance of the evidence to prevail. 22 U.S.C. § 9003(e)(2)(B).

The parties stipulated to Petitioner's *prima facie* case for wrongful removal.[25] They agreed that (1) D.A.'s habitual residence at the time of his removal was Greece, and (2) Petitioner had custodial rights pursuant to Greek law. (Tr. 37-38).

---

[25] As other courts have recognized, there is an inherent tension between deeming, for purposes of Petitioner's *prima facie* case, that D.A.'s removal from Greece was "wrongful," and then determining that Petitioner ultimately consented to D.A.'s move. *See, e.g.*, *In re Kim*, 404 F.

12

### A. Consent to D.A.'s removal and Retention in the United States

The Court finds that the credible evidence in this matter establishes, by a preponderance, that, Petitioner consented to D.A. moving with his mother and sister from Greece to the United States on December 13, 2013. (Tr. A 136-38). This evidence includes the testimony of Respondent, Toula and D.A., as corroborated by December 2013 audio recording of Petitioner stating that he had given permission for them to move.[26]

The Court rejects Respondent's claim that he had no idea that his wife was planning to move to the United States with D.A. until he spoke to her on the phone after they had left, on January 6, 2014. This claim is not only contradicted by the previously mentioned testimony and December 2013 audio recording, but by the evidence regarding Respondent's substantial preparations for the move, such as selling numerous pieces of furniture and other household items, and the packing of numerous boxes over a long period of time. *See* Section I.C, *supra*.

---

Supp. 2d 495, 515 n.38 (S.D.N.Y. 2005) (citing Paul R. Beaumont & Peter E. McEleavy, The Hague Convention on International Child Abduction 131 (P.B. Cartered 1999) ("'[I]f a custodian consents to a removal or retention, can those acts be described as wrongful?'")). The Court agrees with the *In re Kim* court in viewing this issue as "one of burden" and consent as a defense once a *prima facie* case of wrongful removal is established. *Id.*

[26] With respect to the audio recording, the Court does not credit Petitioner's testimony that he and Respondent had a private, unrecorded conversation immediately after the recorded conversation, in which, according to Petitioner, he told his wife that she could not remain in the United States. The Court does not believe that this conversation occurred, and further believes that Petitioner concocted it after hearing the recordings, which was only after this case was filed in the United States. Aside from the Court's assessment of Petitioner's demeanor and credibility during the trial, Petitioner's failure to mention this conversation, which occurred only 10 days before Respondent's departure, in his petition is compelling evidence that it never occurred, and that it was a post-hoc fabrication prompted by Respondent's production of the recordings during discovery in this case. The Court further does not credit Petitioner's explanation of his statement, "you should go," in the taped conversation as being limited to giving permission for Respondent and D.A. to go to the United States for vacation only. The context of the conversation makes clear that this was not what he meant. *See* FN 12, *supra*.

Accordingly, the Court finds that Petitioner consented to Respondent's removal of D.A. from Greece on December 13, 2013, and his retention in the United States thereafter.[27] *See In re Kim*, 404 F. Supp. 2d at 520-21 (determining, based on the credibility of the witnesses, that the respondent established by a preponderance of the evidence that the petitioner consented to the child's move).

### B. Age and Maturity Exception

The Court finds that the age and maturity exception provides another basis for refusing to order D.A.'s return to Greece and that D.A. is sufficiently mature to object to his return and has credibly done so. (Tr. A 134-35).

The Court's finding is based largely on its interview of D.A. As previously discussed, the Court found D.A. to be an exceptionally bright, thoughtful, sociable and well-adjusted adolescent. The Court also finds that D.A.'s reasons for wanting to remain in the United States are rational and well-considered: (1) superior educational opportunities, especially in D.A.'s areas of interest, *i.e.*, science and computer science; (2) the chance to participate in a wide range of extracurricular activities; (3) an abundance of relatives with whom he is very close; and (4) more and better friendships. The sincerity and rationality of D.A.'s motivations and desires was corroborated by the testimony of D.A.'s family members, who credibly testified about how much fuller and happier D.A.'s life has become since moving to the United States. Accordingly, the Court finds that the age and maturity exception applies to this case to permit the Court to refuse to order D.A.'s return to Greece.

---

[27] Indeed, it seems that the only obstacle to Petitioner joining or visiting his family in the United States is Petitioner's failure to resolve his outstanding arrest warrant for failure to pay child support. As of the trial, Petitioner and Respondent were still married. (Tr. 42.)

## III. CONCLUSION

Because the evidence shows that Petitioner consented to D.A.'s removal from Greece in December 2013 and because D.A. is sufficiently mature to object to his return to Greece and has done so, the petition for D.A.'s return to Greece, pursuant to Article 13 of the Hague Convention, is denied. The Clerk of the Court respectfully is directed to enter judgment in Respondent's favor and terminate this action.

SO ORDERED:

/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: May 14, 2015
Brooklyn, New York